UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
MIGUEL BAUTISTA,                                         Case No. 20 Civ. 4676

           Plaintiff,

                                                             **COMPLAINT**
                                                             **AND JURY DEMAND**

    -against-


CHANEL, INC., and
JULIE PAPAIOANNOU,

           Defendants.
----------------------------------------------------------x

         Plaintiff Miguel Bautista ("Plaintiff" or "Bautista"), by his attorneys, Beranbaum Menken LLP, complaining of Defendants Chanel, Inc. ("Chanel" or "the company"), and Julie Papaioannou ("Papaioannou"), alleges:

## PRELIMINARY STATEMENT

         1.       From May of 2015 to January 17, 2019, Plaintiff Miguel Bautista worked as a makeup artist at Chanel's Saks Fifth Avenue store. He brought the company nearly a decade and a half of experience serving film-industry clients and fashion leviathans, and by every objective standard his performance was exemplary.

         2.       With the arrival of a new supervisor in September 2016—Cosmetics Business Manager Julie Papaioannou ("Papaioannou")—Bautista, an Ecuadorian immigrant, suddenly found himself subject to a stream of anti-Latinx sentiment. Repeatedly over the course of the next two years, Papaioannou falsely accused Bautista of theft, threatened him with baseless disciplinary actions, and subjected him to a selectively enforced "English-only" policy at work.

         3.       When Bautista complained to Human Resources, he was met with retaliation from both Papaioannou and the company, culminating in his termination on January 17, 2019.

4. This action is brought to remedy claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.*

5. Plaintiff seeks economic, compensatory and punitive damages, as well as attorney's fees and all other appropriate relief pursuant to federal and local law.

## JURISDICTION AND VENUE

6. On July 23, 2019, Mr. Bautista filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission, complaining of the unlawful discriminatory acts alleged herein, and obtained from the agency a Notice of Right to Sue, dated March 26, 2020, less than 90 days prior to the filing of this Complaint.

7. Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This Court also has supplemental jurisdiction over Mr. Bautista's city law claims pursuant to 28 U.S.C. § 1367.

8. As Defendant Chanel regularly does business within the Southern District of New York, venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 42 U.S.C. § 2000e-5(f)(3). Additionally, the acts that form the basis of this lawsuit occurred within this jurisdiction.

## PARTIES

9. At all times relevant to this action, Miguel Bautista was a resident of New York County. Mr. Bautista is originally from Ecuador.

10. Defendant Chanel, Inc. ("Chanel"), is a New York corporation specializing in the purveyance of high-end apparel, fragrances, accessories, makeup, and other products. Its

principal place of business is New York City. Chanel employed Bautista as a Makeup Specialist at its Saks Fifth Avenue location in Manhattan.

11. At all times relevant to this action, Defendant Chanel was Bautista's employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

12. Defendant Julie Papaioannou is an individual who was an employee of Chanel and acted as Bautista's supervisor from September 2016 until his termination on January 17, 2019. On information and belief, Papaioannou had the authority to hire and fire Mr. Bautista.

13. Defendant Papaioannou was, at all relevant times, a Chanel employee and Mr. Bautista's supervisor, and was therefore Mr. Bautista's employer within the meaning of the NYCHRL, N.Y.C. Admin. Code § 8-102.

## FACTUAL ALLEGATIONS

### Mr. Bautista's Successful Career at Chanel

14. In the nearly 15 years leading up to Bautista's employment with Chanel in 2015, Bautista had already established an excellent reputation as a makeup artist in Ecuador and New York City, creating looks for clients in the Ecuadorian film industry and, later, for New York City fashion leviathans like Guerlain, Shu Uemura, Yves St. Laurent, and Clarins. He also worked as a L'Oréal Face Designer for Giorgio Armani at Saks Fifth Avenue.

15. Chanel hired him as a Beauty Advisor in May 2015.

16. He was quickly promoted to Makeup Specialist, where he continued to excel as one of Chanel's top performers in its Saks Fifth Avenue store.

17. As a Makeup Specialist, Bautista consistently met and exceeded sales goals. He was also a leader in registering clients through Chanel's CCA+ system—a significant measure of his success on the job and his value to the company.

18. In December 2017, for example, Bautista outperformed the average registration rate by 29 points, achieving a rate of 90% compared to the average of 61%.

19. A generous colleague and team player, Bautista consistently made the effort to share his expertise with coworkers and advise them on how raise their own registration rates.

20. By all objective measures, Bautista had no reason to fear for his job security.

<u>Papaioannou's Anti-Latinx Discrimination</u>

21. Everything changed for Bautista with the arrival of Julie Papaioannou, his new supervisor, in September 2016.  Suddenly, Bautista found himself increasingly subject to discipline despite his objectively strong performance on the job.

22. As described in further detail below, Bautista was subject to a series of false accusations by Papaioannou shortly after her arrival.

23. By the fall of 2017, however, it became obvious to Bautista that Defendants' campaign of hostility against him was motivated by his national origin.

24. While Bautista was one of a handful of Latinx employees at the Saks Fifth Avenue Chanel, he spoke English with the strongest Spanish accent.

25. This clearly drew Papaioannou's ire.  In September 2017, her discriminatory disdain for Bautista's Spanish accent became clear during a session in which she offered him work-related guidance.

26.     At the end of their conversation, instead of confirming that they were on the same page or that Bautista properly understood her feedback, Papaioannou, a native English speaker, contemptuously and condescendingly said to him in Spanish, "*Comprende?*"

27.     Then, in or around February 2018, Papaioannou began to enforce a purported "English-only" policy on the sales floor which, in reality, was a "No Spanish" policy.

28.     One day, while Bautista was chatting in Spanish with coworkers Alicia Acosta and Margarita Cabrales, outside the presence of customers, Papaioannou approached the three of them and announced that they were forbidden from speaking Spanish on the floor.

29.     Bautista, who had worked at Chanel's Saks Fifth Avenue location for nearly three years at this point, was shocked by her announcement. Because Papaioannou did not insist that French- and Chinese-speaking employees speak only English, Bautista felt specifically targeted for being Latino.

30.     As an immigrant from Ecuador who dedicated himself to learning English and working his way up in the fashion industry, Bautista found himself suddenly "othered" by his boss—the person most empowered to threaten his job security.

31.     Given that Papaioannou only applied the English-only policy to native Spanish speakers, while allowing French- and Chinese- speakers to speak their native language, the policy was effectively a "No Spanish" policy.

<u>Defendants' Discriminatory Targeting of Bautista</u>

32.     Papaioannou's discriminatory animus against Bautista did not stop with her mocking his Spanish accent or forbidding him from speaking Spanish while at the makeup counter.  On at least three separate occasions, Papaioannou sought to smear Bautista by falsely and baselessly accused him of stealing.

5

33. One such accusation came in September 2017, during one of Bautista's one-on-one "Touchbase" meetings with Papaioannou.

34. Chanel's policies prohibit more than one employee from receiving a commission from the same sale without permission from a manager.

35. Bautista had submitted the same receipt for a commission as his coworker, but he had done so with the express permission of Fragrance Business Manager Ana Fernandez.

36. When Bautista explained this fact to Papaioannou, she admitted that she had failed to speak to Fernandez prior to leveling her accusation against Bautista. She then acknowledged that Bautista's receipt submission was not a violation after all.

37. Bautista grew concerned that Papaioannou was beginning to build a termination case against him, even though his job performance was strong and he was well liked by his colleagues.

38. Humiliated and dispirited, rather than quit the job to which he was so dedicated, Bautista redoubled his efforts to outperform himself and serve Chanel's customers.

39. Still, Papaioannou baselessly accused Bautista of stealing a second time in January 2018 during their one-on-one Touchbase meeting.

40. This time, Papaioannou claimed that Bautista violated Chanel protocol by submitting a receipt that contained more than three items with the same stock-keeping unit ("SKU" or barcode).

41. At that time, Chanel policy prohibited selling more than five items per transaction with the same SKU.

42. This five-item limit had recently been changed to a three-item limit, but the three-item limit was not yet in effect when Bautista submitted his receipt.

43. Once again, Papaioannou approached Bautista with hostility instead of making a good-faith effort to inquire about what happened.

44. Papaioannou later admitted to Bautista in an email that, because the three-item limit had yet to take effect, he had not, in fact, violated any protocol.

45. Still, in that same email, Papaioannou threatened Bautista with disciplinary action, writing, "I explained to you that the December receipts are in the process of being evaluated and if violations are found, then further disciplinary action will take place."

46. She later made good on her threat and attempted to write Bautista up again in February 2018 for allegedly violating Chanel's policy of selling no more than ten items per transaction.

47. As with the incident in September 2017, Ms. Fernandez, the Fragrance Business Manager, had signed off on the submission of this receipt—meaning Bautista did not violate Chanel policy.

48. Papaioannou, not even bothering to check in with Ms. Fernandez, instead used the opportunity as an excuse to continue hounding Bautista for fabricated offenses against the company.

49. For the third time, Papaioannou was forced to admit that no violation actually occurred.

### Bautista Formally Complains of Discrimination

50. Concerned that Papaioannou's series of false allegations against him were motivated by her discriminatory animus against him based on his national origin, Bautista decided to seek help and protection from Chanel's human resources department.

51. Shortly after the February 2018 incident, Bautista raised the issue of Papaioannou's discriminatory animus against him with Catherine Koenig ("Koenig"), Chanel's People & Organization Specialist—reasonably and in good faith believing Papaioannou had acted in violation of anti-discriminations laws. He urgently explained his concern that Papaioannou was targeting him for discipline and attempting to get him fired because he is Latino and speaks with an accent.

52. He engaged in similar protected activity on May 16, 2018, when he further complained about Papaioannou's discriminatory remarks and actions at an in-person meeting with Koenig.

53. Bautista has reason to believe that other employees confirmed to Koenig that Papaioannou was selectively enforcing the English-only rule against Spanish speakers.

54. Still, despite this corroboration of Bautista's complaint from other employees, and despite Papaioannou's several baseless attempts to discipline him, Bautista received a letter from Chanel, signed by Koenig, on March 22, 2018, which stated "Though we could not confirm your allegations of discrimination, it does appear that there have been occasions when Ms. Papaioannou has failed to properly communicate in a clear and concise manner to both you and the team."

55. "As a result," Koenig continued, "I have used this opportunity to reaffirm our Non-Discrimination and Anti-Harassment Policy to Julie."

56. Despite having found misconduct by Papaioannou and, according to its letter, having taken "appropriate action," Chanel brazenly attempted to whitewash Bautista's discrimination complaints, dismissing them as little more than a "communication" issue while

simultaneously finding it necessary to reiterate the company's Non-Discrimination and Anti-Harassment Policy to Papaioannou.

### Defendants' Retaliation Against Bautista

57. Despite the promise Chanel made in its March 22 letter that it would not tolerate "any form of retaliation" against Bautista because of his discrimination complaints, Bautista soon found himself subject to escalated adverse treatment by Papaioannou.

58. In June 2018, Papaioannou blatantly ignored Bautista's request for the day off to participate in the City's LGBTQ Pride festivities.

59. When Bautista brought his ignored request to her attention, Papaioannou professed that she would "take care of it" but never made any arrangements to give Bautista the day off.

60. This was in stark contrast to the period of time preceding Bautista's discrimination complaints, when Papaioannou typically accommodated his requests for days off.

61. Papaioannou granted the requests of every gay employee who asked for the day off to celebrate Pride, except for Bautista's.

62. She retaliated against Bautista once more on November 11, 2018—this time, again, with a false accusation of stealing.

63. That day, Bautista rang up a sale for a customer who had also interacted with a freelance makeup artist near the Chanel counter. As was customary at the Chanel counter, Bautista rang up the sale because he had been the primary driver of the transaction from the moment the client arrived at the counter.

64. Papaioannou, however, accused Bautista, in front of his coworkers, of stealing the client from the makeup artist. Her accusation was not only baseless and defamatory; it was humiliating.

65. When the freelance makeup artist confirmed Bautista's account of what happened, Papaioannou once again backpedaled and claimed that she had merely been inquiring into what happened with the customer.

66. In response, Bautista stood up for himself against Papaioannou's discriminatory behavior. He expressed that this was not the first time she had questioned his integrity and requested that she "stay away" from him.

67. Papaioannou responded by accusing Bautista—who had not done so much as raise his voice—of being "out of hand."

68. Papaioannou made similar remarks in another conversation with Bautista, in which she accused him of having an "aggressive," "loud," and "emotional" tone of voice.

69. Bautista reported the November 11, 2018 incident, as well as the June 2018 scheduling incident, to Koenig on November 15, 2018.

70. At this November 15, 2018 meeting, Bautista told Koenig that he believed Papaioannou was retaliating against him for reporting her discriminatory no-Spanish policy.

71. Koenig erroneously informed Bautista that these acts did not constitute retaliation because they did not involve Bautista's identity as a non-native English speaker.

72. Rather than reassuring Bautista that Papaioannou's retaliation would not be tolerated, implementing a training, and/or disciplining Papaioannou, Koenig later called Bautista into her office on January 17, 2019, to "close out the investigation" by terminating Bautista's employment.

Conclusion

73. Bautista has suffered substantial emotional distress as a result of Chanel's discriminatory treatment and subsequent retaliation against him.

74. Beginning in March 2018, he began to experience symptoms of anxiety and depression, including, but not limited to, panic attacks, weight loss, loss of appetite, difficulty sleeping, tearfulness, and feelings of worthlessness.

75. Bautista's primary care doctor prescribed him anti-anxiety medication in November 2018 to treat these symptoms and referred him to a psychiatrist.

76. Before March 2018, Bautista had never required medication for anxiety.

77. Bautista's termination has also caused him significant distress, heightened by the fact that for a period of time he could no longer afford to send money to his ailing father in Ecuador.

## FIRST CAUSE OF ACTION
### (Race and National Origin Discrimination, Against Defendant Chanel)
### Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*

78. Plaintiff repeats and incorporates by reference all of the above allegations as if fully set forth herein.

79. Plaintiff, a Spanish-speaking immigrant from Ecuador, belongs to a protected class on the basis of his race and national origin.

80. Defendant Chanel repeatedly discriminated against Plaintiff with respect to the terms, conditions, and privileges of his employment because of his race and national origin, in violation of 42 U.S.C. § 2000e-2(a), by, among other practices, instituting a no-Spanish policy at work, levying baseless accusations and threats of discipline against him, and terminating his employment.

81. As a result of Defendant's intentional discrimination, Plaintiff has suffered damages in the form of emotional distress and lost income, including lost income as a result of his termination, and is entitled to reinstatement, backpay, front pay, attorney's fees, and any such other declaratory or injunctive relief the Court deems proper.

82. Defendant's discriminatory practices were committed with malice or reckless indifference to Plaintiff's federally protected rights.

## SECOND CAUSE OF ACTION
### (Retaliation, Against Defendant Chanel)
### Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*

83. Plaintiff repeats and incorporates by reference all of the above allegations as if fully set forth herein.

84. Defendant unlawfully retaliated against Plaintiff, in violation of 42 U.S.C. § 2000e-3(a), by wrongfully disciplining him and terminating his employment as a consequence for opposing unlawful discriminatory practices.

85. As a result of Defendant's discriminatory retaliation, Plaintiff has suffered damages in the form of emotional distress and lost income, including lost income as a result of his termination, and is entitled to reinstatement, backpay, front pay, attorney's fees, and any such other declaratory or injunctive relief the Court deems proper.

86. Defendant's discriminatory practices were committed with malice or reckless indifference to Plaintiff's federally protected rights.

## THIRD CAUSE OF ACTION
### (Race and National Origin Discrimination, Against All Defendants)
### New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.*

87. Plaintiff repeats and incorporates by reference all of the above allegations as if fully set forth herein.

88. Plaintiff, a Spanish-speaking immigrant from Ecuador, belongs to a protected class on the basis of his race, national origin, and alienage/citizenship status.

89. Defendants have repeatedly discriminated against Plaintiff with respect to the terms, conditions, and privileges of his employment, in violation of N.Y.C. Admin. Code §§ 8-107(1)(a)(2)-(3), by, among other practices, instituting a no-Spanish policy at work, levying baseless accusations and threats of discipline against him, and terminating his employment.

90. As a result of Defendants' intentional discrimination, Plaintiff has suffered damages in the form of emotional distress and lost income, including lost income as a result of his termination, and is entitled to reinstatement, backpay, frontpay, attorney's fees, and any such other declaratory or injunctive relief the Court deems proper.

91. Defendants' discriminatory practices were committed with malice or reckless indifference to Plaintiff's statutorily protected rights.

## FOURTH CAUSE OF ACTION
**(Retaliation, Against All Defendants)**
**New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101** *et seq.*

92. Plaintiff repeats and incorporates by reference all of the above allegations as if fully set forth herein.

93. Defendants unlawfully retaliated against Plaintiff, in violation of N.Y.C. Admin. Code § 8-107(7), by wrongfully disciplining him and terminating his employment as a consequence for opposing unlawful discriminatory practices.

94. As a result of Defendants' intentional discrimination, Plaintiff has suffered damages in the form of emotional distress and lost income, including lost income as a result of his termination, and is entitled to reinstatement, backpay, frontpay, attorney's fees, and any such other declaratory or injunctive relief the Court deems proper.

95. Defendants' discriminatory practices were committed with malice or reckless indifference to Plaintiff's statutorily protected rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

a. Declaring the acts, policies, and practices complained of herein to be violations of Title VII of the Civil Rights Act of 1964 and the New York City Human Rights Law;

b. Enjoining and permanently restraining these violations;

c. Directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated;

d. Directing Defendants to make Plaintiff whole for all earnings and other amounts or benefits he would have received but for Defendants' discriminatory, retaliatory, and unlawful conduct, including, but not limited to, wages, overtime, bonuses, and other lost benefits;

e. Directing Defendants to pay Plaintiff compensatory damages for his emotional distress;

f. Directing Defendants to pay Plaintiff punitive damages pursuant to 42 U.S.C. § 1981a(a)(1) and N.Y.C. Admin. Code § 8-502(a).

g. Awarding Plaintiff such interest as is allowed by law;

h. Awarding Plaintiff reasonable attorney's fees and costs; and

i. Granting Plaintiff such other and further relief as the Court deems necessary and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated:  June 18, 2020
        New York, New York

By: _____
Scott Simpson
BERANBAUM MENKEN LLP
80 Pine Street, 33rd Floor
New York, NY 10005
Tel.: (212) 509-1616
Fax: (212) 509-8088

*Attorney for Plaintiff*